### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| RONALD GREENE, | : | Case No. 3:16-cv-46 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.  Introduction

Plaintiff Ronald Greene brings this case challenging the Social Security Administration's denial of his applications for a period of disability, Disability Insurance Benefits, and Supplemental Security Income.  He asserted that after working as an electroplater for over eighteen years, he could no longer work a substantial paid job due to cervical spine injuries, arthritis, depression, and blindness in his left eye. Administrative Law Judge (ALJ) Elizabeth A. Motta concluded that he was not eligible for benefits because he is not under a "disability" as defined in the Social Security Act.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. #14), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Motta's non-disability decision.

## II.  **Background**

Plaintiff asserts that he has been under a disability since June 1, 2011. He was forty-six years old at that time and was therefore considered a "younger individual" under Social Security Regulations. He has a high school education.

### A.  **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Motta that he is disabled due to difficulty with his neck, shoulders, left arm, and left hand. (Doc. #6, *PageID* #107). In early 2012, he began having increased pain and numbness in his left hand, arm, and shoulder. *Id.* at 114. He started dropped things he was holding in his left hand. *Id.* For example, he dropped coffee filters without even noticing and was not able to hold a bottle in his left hand while trying to remove the top with his right hand. *Id.*

Plaintiff testified that a MRI in September 2012 revealed two large central disc herniations. *Id.* at 116. At the time, he did not have health insurance, but his physician contacted and then arranged for him to receive treatment pro bono at Wexner Medical Center in Columbus, Ohio. *Id.* The doctor who saw Plaintiff "suggested that it wasn't as bad as [he] thought it was, and wanted [him] to come back up on multiple occasions for

2

physical therapy." *Id.* Due to financial constraints, Plaintiff was not able to attend physical therapy in Columbus. *Id.* at 116-17.

Plaintiff testified that his conditions continued to worsen, and in November 2013, he underwent fusion surgery to replace two cervical discs and put a titanium plate in his neck. *Id.* at 107-08, 117. The surgery did not help his left arm, and he still suffers from numbness, tingling, and constant twitching in his left hand and fingers. *Id.* at 108. He is also limited in how far he can turn his head, and he can only hold a couple pounds in his left hand and ten to fifteen pounds in his right hand. *Id.* at 121.

His physician prescribed a muscle relaxer and pain medication, but "neither of them help very much, and the side effects keep [him] from taking them on a daily basis, because they mess with [his] sleep patterns." *Id.* at 108. He explained that as a result, he only takes the pain medication if he has a "really rough day." *Id.* at 111. On a scale from one to ten, Plaintiff rated his pain severity at eight before surgery, six after surgery on good days, and eight after surgery on bad days. *Id.* at 117-18. His has ten to twelve bad days per month, and on those days, he spends most of the day in his recliner and does not leave the house. *Id.* at 118.

In 2012, Plaintiff began experiencing numbness in his left leg. *Id.* at 115. He explained that if he stands for more than twenty to thirty minutes, the top half of his leg goes numb. *Id.* at 116. He also has a little numbness in his right hand and some tingling in his left thigh. *Id.* at 109. He is also legally blind in his left eye. *Id.* at 120. He can see enough to walk, read, or drive, but he cannot judge distances. *Id.*

3

He has not received treatment, via counseling or medication, for any mental impairment.  *Id.* at 122.

Plaintiff lives with his wife and two teenage children.  *Id.* at 104.  He worked as an electroplater for over eighteen years and was terminated due to a difference of opinion with his employer.  *Id.* at 106.  He has a driver's license and drives a few times a week. *Id.* at 104-05.  He is able to go to the grocery store for short trips.  *Id.* at 110.  He is also able to help some in the kitchen.  *Id.* at 109.  He has not done yard work for "a couple years."  *Id.*  Plaintiff tries to do some laundry but raising his hand over his shoulder causes pain.  *Id.* at 110.  He is able to dress himself, and although he has difficulty washing his hair, he can also take a bath or shower.  *Id.* at 112.  Plaintiff spends "a lot of time in [his] recliner, with a pillow up behind [his] neck."  *Id.* at 110.  Generally, he watches television.  *Id.* at 113.

### B.    Vocational Expert's Testimony

Eric Pruitt, a vocational expert, classified Plaintiff's past employment as an electroplater, classified at the medium, skilled level.  *Id.* at 123.  The ALJ posed the following hypothetical to Mr. Pruitt:  Are there jobs available, regionally and nationally, for an individual of Plaintiff's age, education, and work experience who is limited to lifting twenty pounds occasionally and ten pounds frequently; only occasional postural activities such as climbing stairs and ramps, balancing, stooping, kneeling, crouching, or crawling; no climbing ropes, ladders, or scaffolds; no exposure to hazards, such as dangerous machinery or working at unprotected heights; no exposure to vibration; only occasional overhead reaching bilaterally, and frequent reaching in other directions; no

exposure to extremes of cold or heat; frequent handling and fingering bilaterally; and low stress work, defined as no strict production quotas or fast pace and only routine work with few changes in work setting.  *Id.* at 123-24.

Mr. Pruitt responded that the hypothetical individual could not perform Plaintiff's past work but could perform approximately 3.7 million light, unskilled jobs in the national economy such as a storage facility rental clerk, label coder, or routing clerk.  *Id.* at 124-25.  Additionally, the individual could perform 242,000 sedentary, unskilled jobs such as a printed circuit board inspector, table worker, or addresser.  *Id.* at 125-26.  Mr. Pruitt further testified that an individual could not maintain competitive employment if he was off task more than ten percent of the workday beyond normal breaks or missed three days of work per month.  *Id.* at 128-30.

### C.    Medical Opinions

#### i.  <u>Suzann K. Franer, D.O.</u>

Plaintiff began treatment with Dr. Franer, his primary-care physician, in August 2012.  *Id.* at 526.  Dr. Franer first completed a questionnaire on December 21, 2012.  *Id.* at 364.  She noted that Plaintiff had a history of cervical spinal fusion and increasing left arm and neck pain.  *Id.*  Additionally, he had full muscle strength in his upper extremity and hyper reflexes in left upper extremity.  *Id.*  Dr. Franer concluded that Plaintiff could not work at a job where he had to reach above shoulder level, lift more than twenty pounds, or turn his head a lot.  *Id.* at 365.

On September 12, 2014, Dr. Franer completed interrogatories and a medical assessment.  *Id.* at 526-39.  She noted she first saw Plaintiff in August 2012 and last saw

him in December 2013.  *Id.* at 526.  Dr. Franer opined that he could stand/walk for thirty minutes at one time for a total of four hours in an eight-hour workday and sit for one hour at one time for total of six hours.  *Id.* at 536.  He could never kneel or crawl, and his ability to reach, handle, and push/pull were affected by his impairments.  *Id.* at 537.  He could not lift more than fifteen pounds occasionally and ten pounds frequently.  *Id.* at 536.  She indicated that Plaintiff's limitations were caused by his cervical radiculopathy. *Id.* at 535-38.  She found that Plaintiff has the ability to perform sedentary work but not light work.  *Id.* at 538-39.

Dr. Franer opined that due to his pain, Plaintiff would not have the ability to be prompt and regular in attendance; withstand the pressure of meeting normal standards of work productivity and work accuracy without significant risk of physical or psychological decompensation or worsening of his physical and mental impairments; sustain attention and concentration on his work to meet normal standards of work productivity and work accuracy; demonstrate reliability; maintain concentration and attention for extended periods (approximately two hour segments); perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; or complete a normal workday and workweek without interruption from psychologically and/or physically based symptoms and perform at a consistent pace without unreasonable numbers and length of rest periods.  *Id.* at 527-32.  She concluded that Plaintiff had slight restrictions in activities of daily living and difficulties in maintaining social function and moderate deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner.  *Id.* at 534.

6

### ii. **David K. Magnusen, M.D.**

Dr. Magnusen, a physical medical and rehabilitation specialist, completed an assessment on May 14, 2013.  *Id.* at 421-42.  Dr. Magnusen diagnosed cervical poly radiculopathy with or without cord compression and disc herniation at C34 and C67.  *Id.* at 431.  He noted Plaintiff had blunted or absent reflexes in his upper limbs.  *Id.*  Dr. Magnusen based his findings on an MRI from September 2012 and an EMG from May 2013.  *Id.*  He opined that Plaintiff could not lift or carry over ten pounds, and he had no limitations in sitting, standing, or walking.  *Id.* at 432.  Additionally, he had poor grasp and fine motor function in his right hand, causing "difficulty opening jars/packages, writing, buttons, etc."  *Id.*  He was able to raise his arms overhead but had some weakness in his shoulder.  *Id.*

### iii. **Damian M. Danopulos, M.D.**

Dr. Danopulos examined Plaintiff on January 7, 2013.  *Id.* at 386-89.  Dr. Danopulos noted that Plaintiff's cervical and lumbar spine motions were restricted and painful.  *Id.* at 388.  His objective findings were "1) status post cervical spine discectomy 15 years ago with current considerable arthritic changes, 2) lumbar spine arthritic changes and 3) specific headaches."  *Id*. at 389.  He concluded that Plaintiff's "ability to do any work related activities is affected and restricted from the combination of his status post discectomy, considerable cervical spine arthritic changes and mild to moderate lumbosacral spine arthritic changes."  *Id*.

### iv.  Esberdado Villanueva, M.D., & Gary Hinzman, M.D.

On February 16, 2013, Dr. Villanueva reviewed Plaintiff's record. *Id.* at 136-46.

He opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten

pounds frequently, stand and/or walk for six hours in an eight-hour workday, and sit for

six hours in a workday. *Id.* at 144.  Dr. Villanueva found that his ability to push/pull was

limited in his upper left extremity. *Id.*  Additionally, he could frequently climb

ramps/stairs, balance, stoop, kneel, and crouch; occasionally crawl; and never climb

ladders, ropes, or scaffolds. *Id.* at 145.  He could only occasionally reach overhead to the

left. *Id.*  He concluded Plaintiff was not disabled. *Id.* at 148.

Dr. Hinzman reviewed Plaintiff's records on May 21, 2013 and agreed with Dr.

Villanueva's assessment. *Id.* at 151-64.  He added that Plaintiff's fine manipulation was

limited in his left hand. *Id.* at 160.

### v.  Mary Ann Jones, Ph.D.

Dr. Jones interviewed and evaluated Plaintiff on November 15, 2012. *Id.* at 378-

84.  Plaintiff reported that he could not work due to severe neck and back problems,

numbness of his left arm and left leg, and blindness in his left eye. *Id.* at 379.  He

characterized his mental health as fair to poor and noted that he suffers from depression,

anger, irritability, memory and concentration problems, bad dreams, and difficulty coping

with stress. *Id.* at 380.

Dr. Jones reported that Plaintiff presented as resigned and dysphoric. *Id.* at 381.

His affect was sad and he was preoccupied with his own symptomatology. *Id.*  He

reported crying episodes and angry outbursts two to three times per week. *Id.*  He also

8

has panic attacks twice a month.  *Id.*  Dr. Jones diagnosed Pain Disorder and Dysthymic Disorder and assigned a Global Assessment of Functioning (GAF) score of 53.  *Id.* at 383.  She opined that Plaintiff could understand, remember, and carry out instructions in a work setting within the low-average range of intelligence.  *Id.* at 384.  Additionally, "there appear to be no major limitations in [Plaintiff's] ability to sustain appropriate attention and concentration and to maintain adequate persistence and pace in order to perform various work tasks."  *Id.*  Dr. Jones further noted that he reported difficulty getting along with coworkers and supervisors, and "[i]t is likely that his current preoccupation with his medical conditions and his depression would negatively impact his ability to respond appropriately to coworkers and supervisors in a work setting."  *Id.*  Additionally, he has some limitations in his ability to cope appropriately to common workplace pressures.  *Id.*

### vi.  **Dr. Caroline Lewin, Ph.D., & Vicki Warren, Ph.D.,**

Dr. Lewin reviewed Plaintiff's records on November 21, 2012.  *Id.* at 136-49.  She opined that Plaintiff has a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no episodes of decompensation.  *Id.* at 142-43.  Additionally, he was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public.  *Id.* at 146-47.  Additionally, he would be

precluded from jobs requiring fast pace and was limited to occasional superficial interactions with others. *Id.*

On May 23, 2012, Dr. Warren reviewed Plaintiff's record and affirmed Dr. Lewin's assessment. *Id.* at 151-64.

## III.  Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a).  The term "disability"— as defined by the Social Security Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard

is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry— reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    **The ALJ's Decision**

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. §§ 404.1520, 416.920.[2] She reached the following main conclusions:

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

Step 1:     Plaintiff has not engaged in substantial gainful employment since June 1, 2011.

Step 2:     He has the severe impairments of cervical degenerative disc disease and left eye blindness.

Step 3:     He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     His residual functional capacity (RFC), or the most he could do in a work setting despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work . . . , including lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, subject to the following additional limitations: while the claimant can do light lifting with the right, dominant arm, lifting and carrying is limited to a maximum of 10 pounds with the left, non-dominant arm; occasional postural activity, including stooping, balancing, kneeling, crawling, crouching, and climbing ramps and stairs; no climbing of ladders, ropes, or scaffolds; no exposure to hazards, such as dangerous machinery or unprotected heights[;] no exposure to vibration; no more than occasional overhead reaching bilaterally or frequent reaching in other directions; no jobs that require constant twisting of the head; no exposure to extremes of cold or heat; no more than frequent fingering and handling bilaterally; and secondary to his physical impairments only, he is limited to low stress work, defined as no strict production quotas or fast pace and only routine work with few changes in the work setting."

Step 4:     He is unable to perform any of his past relevant work.

Step 5:     He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 76-94).  These main findings led the ALJ to ultimately conclude that

Plaintiff was not under a benefits-qualifying disability.  *Id.* at 94.

## V.     <u>Discussion</u>

Plaintiff contends that the ALJ erred at step two of the sequential evaluation by

failing to find that he suffered from a severe psychological impairment and by failing to

properly consider any corresponding limitations.  Additionally, he asserts that the ALJ's failure to follow the Regulations in evaluating the opinion evidence and in weighing his credibility, pain, and symptom severity denotes a lack of substantial evidence and error as a matter of law.  The Commissioner maintains that substantial evidence supports the ALJ's step-two determination, evaluation of medical opinions, and credibility determination.

### A.    Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions.  "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

13

The regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

Plaintiff contends that the ALJ failed to properly weigh the opinions of his treating physicians, Dr. Franer and Dr. Magnusen.

The ALJ found that Dr. Franer's first opinion was entitled to "significant weight for the period prior to the demonstrated worsening of [Plaintiff's] condition that resulted in fusion surgery in October 2013." (Doc. #6, *PageID* #91). She noted it was supported by the mild-to-moderate objective test results and mild examination findings. *Id.*

In comparison, the ALJ found that Dr. Franer's second assessment was entitled to "minimal weight" and provided several reasons for her determination. *Id.* at 92. The ALJ properly determined that Dr. Franer did not provide any support in her assessment for Plaintiff's limitations. *Id.* at 92; *see* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). For example, Dr. Franer indicates Plaintiff can only stand/walk for four hours. (Doc. #6, *PageID* #536). But when asked what medical findings support her assessment, she only notes that he "has cervical radiculopathy." *Id.* She also opines that Plaintiff can occasionally climb,

14

balance, stoop, and crouch, and can never kneel or crawl. *Id.* at 537. When asked what medical findings support her assessment, she again notes, "cervical radiculopathy." *Id.*

The ALJ also correctly found that Dr. Franer's conclusions are inconsistent with her own treatment notes and other medical evidence of record. *Id.* at 91-92; *see* 20 C.F.R. § 404.1527(c)(5) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Dr. Franer noted in December 2013 that Plaintiff reported numbness, pain, and weakness in his left arm; twitching in his little finger and thumb; and weakness of his middle finger. (Doc. #6, *PageID* #464). But in her assessment, Dr. Franer did not indicate that he had any limitations in his ability to finger or feel objects. *Id.* at 537. Similarly, Dr. Franer did not include any limitations on Plaintiff's ability to see. *Id.*

The ALJ accurately observed that Dr. Franer only treated Plaintiff sporadically. *Id.* at 92; *see* 20 C.F.R. § 404.1527(c)(2) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Between August 2012 and April 2015, Dr. Franer only saw Plaintiff five times. She saw him in December 2013, one month after his fusion surgery but did not complete the interrogatories until September 2014, nine months later. (Doc. #6, *PageID* #464). At his appointment in December 2013, she directed Plaintiff to return in six weeks but he did not. *Id.* at 465.

ALJ Motta also noted that Dr. Franer was a family physician, not a physiatrist or neurosurgeon with specific knowledge or expertise regarding Plaintiff's neck and back impairment. *Id.* at 92; *see* 20 C.F.R. §404.1527(c)(5) ("We generally give more weight

15

to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of source who is not a specialist."). Plaintiff, however, correctly observed that Dr. Franer was also a family physician when she completed her first assessment. Although Plaintiff is correct, when considered together, the ALJ's findings regarding Dr. Franer's opinions are supported by substantial evidence and constitute good reasons for the weight she assigned.

Plaintiff asserts that the ALJ applied more rigorous scrutiny to Dr. Flaner's opinions than to the State agency record-reviewing physicians' opinions. (Doc. #9, *PageID* #571). Specifically, the ALJ criticized Dr. Franer's opinion because she did not include limitations in Plaintiff's ability to see, but the ALJ did not mention that the record-reviewing physicians also found that Plaintiff does not have visual limitations. *Id.*

Defendant contends that the ALJ correctly recognized the difference between Dr. Franer's opinion on Plaintiff's vision and the record-reviewing physicians. (Doc. #13, *PageID* #587). Dr. Franer did not identify Plaintiff's blindness in his left eye as an impairment in her assessment, and she opined that he does not have a visual limitations. By comparison, the record-reviewing physicians acknowledge "loss of visual acuity" as an impairment but then conclude that it is non-severe.

The ALJ did not apply more rigorous scrutiny to Dr. Franer's opinion. Treating physicians "are likely to be the medical professionals most able to provide a detailed longitudinal picture of [a individual's] impairment(s) . . . ." 20 C.F.R. §404.1527(c)(2). Dr. Franer's omission of an impairment, severe or non-severe, indicates that her picture of Plaintiff's impairments may not be as detailed and longitudinal as other treating

16

physicians. Although the record-reviewing physicians find that Plaintiff's left-eye blindness is a non-severe impairment, they at least acknowledge its existence.

Additionally, the ALJ only gives the record-reviewing physicians' opinions "some weight." (Doc. #6, *PageID* #90). She notes that their opinions are generally consistent with the record and she added restrictions to their opinions "to include the effects of [Plaintiff's] left eye impairment, as well as the additional findings noted throughout the record." *Id.*

The ALJ found that Dr. Magnusen's opinion was entitled to "significant weight, but only to the extent that those limitations are consistent with the above-described residual functional capacity." (Doc. #6, *PageID* #92). Plaintiff interprets this to mean that the ALJ is rejecting some of Dr. Magnusen's opinions because they are inconsistent with her RFC. (Doc. #9, *PageID* #572). Plaintiff is correct that if an ALJ first determined a plaintiff's RFC and then compared medical opinions to it, that would constitute error. However, that is not what ALJ Motta did in this case. She evaluated Dr. Magnusen's opinion as the Regulations permit. She compared his opinion to the medical evidence, including his own treatment notes, and found that his "conclusions are generally consistent with the medical evidence, concerning the left upper extremity, but his examination records do not note an observed difficulty with right hand function and [Plaintiff] demonstrated full ranges of motion throughout the upper extremities." (Doc. #6, *PageID* #92). The ALJ gave significant weight to Dr. Magnusen's opinion that Plaintiff had no limitations in sitting, standing, or walking; he could bend or stoop; and he could raise his arms overhead with some weakness is his shoulder. *Id.*

17

Dr. Magnusen's treatment records support the ALJ's evaluation. On the two occasions he treated Plaintiff, he found full ranges of motion in Plaintiff's shoulders, elbows, wrists, and fingers. *Id.* at 433, 436. His treatment records do not include any notes indicating Plaintiff had difficulty with right-hand function. *Id.* Similarly, Dr. Franer's and Dr. Poelstra's treatment notes do not indicate that Plaintiff reported any problems with his right hand. *Id.* at 367-72, 420-22, 464-69, 480-94, 542-44. Therefore, substantial evidence supports the ALJ's finding rejecting Dr. Magnusen's right-hand limitations.

### B. Mental Impairments

Plaintiff contends that the ALJ erred at step two of the sequential evaluation by failing to find that he suffered from any severe psychological impairments and by failing to properly consider any corresponding limitations in his residual functional capacity.

At step two, the ALJ considers the "medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4). "An impairment or combination of impairments is not severe if it does not significantly limit [the applicant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The Sixth Circuit has construed step two as a "*de minimis* hurdle." *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988) (citations omitted). Under this view, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* (citation omitted).

In the present case, ALJ Motta found that Plaintiff has two severe impairments: cervical disc disease and left-eye blindness.  (Doc. #6, *PageID* #78).  She also found two non-severe impairments: pain disorder and dysthymic disorder.  *Id.* at 84.

ALJ Motta provided several reasons for her finding that Plaintiff's mental impairments "do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are therefore not severe."  *Id.*  She first noted that during Plaintiff's testimony, he did not allege functional problems related to a possible mental impairment and confirmed that he has not received treatment, including counseling or medication, for any mental impairment.  *Id.* at 81, 122.  The ALJ also assigned the opinion of Dr. Jones, the consulting psychologist, minimal weight.  *Id.* at 83-84.

"[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart,* 710 F.3d at 376.  Instead, the ALJ must consider the following factors to determine the weight given to other medical opinions:  examining relationship; the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization, and other factors.  20 C.F.R. § 404.1527(c), (e).  Although the ALJ is "not bound by the findings made by State agency or other program physicians and psychologists, . . . they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

In the present case, the ALJ separated Dr. Jones' assessment into three categories: diagnoses, GAF scores, and narrative conclusions.  First, the ALJ gave Dr. Jones'

diagnoses of pain and dysthymic disorders the "[b]enefit of the doubt . . . ."  (Doc. #6, *PageID* #84).

The ALJ gave "little weight" to Dr. Jones's GAF scores.  *Id.* at 83.  Dr. Jones assigned Plaintiff a symptom GAF score of 53 and functional GAF score of 55, both indicating moderate limitations.  *Id.* at 383.  The ALJ noted, "the Commissioner has declined to endorse the GAF scale for use in Social Security and SSI disability programs and has indicated GAF scores have no direct correlation to the severity requirements of the mental disorder listings."  *Id.* at 83 (internal quotation marks omitted) (citing 65 Fed. Reg. 50746, 50764-65 (2000)).  Additionally, the scores rely on the subjective complaints of the person being evaluated.  Last, the ALJ "elects to give great weight to [Plaintiff's] actual functioning, which no more than mildly affects his ability to perform the demands of basic work activity."  *Id.*

The ALJ also assigned Dr. Jones's narrative conclusions "minimal weight."  *Id.* at 83.  Dr. Jones noted that Plaintiff reported that he did not always get along with coworkers and supervisors because he had an attitude problem.  *Id.* at 384.  Further, he indicated that he was dismissed from his last two jobs because of problems interacting with supervisors.  *Id.*  Based on those statements, Dr. Jones opined that Plaintiff's preoccupation with his medical conditions and depression would negatively affect his ability to respond to coworkers and supervisors.  *Id.*  Additionally, based on Plaintiff's indication that he did not always cope with work pressure and still does not cope well, she opined that he appears to have some limitations in his ability to cope appropriately to common workplace pressures.  *Id.*

The ALJ recognized that Dr. Jones's opinion is based solely on Plaintiff's subjective complaints.  *Id.* at 83.  She also correctly found it unsupported by the record.  *Id.*  For example, although Plaintiff may have been dismissed from his job following a disagreement with a supervisor, he worked there for over eighteen years.  Notably, Plaintiff did not report any difficulty getting along with coworkers.  Additionally, Dr. Jones noted that he was "cooperative in interaction" throughout her examination.  *Id.* at 380.

Treatment records and opinions from other physicians support the ALJ's finding.  Although Plaintiff reported feelings of depression to his treating physician one time in December 2013, he did not follow up with her and did not report it to any other physician.  *Id.* at 464.  Dr. Franer noted that she "did not see him exhibit any emotionally unstable behavior," and "[h]is behavior is appropriate."  *Id.* at 530.  In addition, Plaintiff did not report any mental impairments to Dr. Danopulos in January 2013.  *Id.* at 386-93.  Dr. Poelstra noted in January 2014 that Plaintiff's mood, affect, and behavior were normal.  *Id.* at 483.  Finally, Dr. Beegan noted in March and June 2014, "[Plaintiff] is generally positive and forward-thinking, and I find no evidence of psychogenic overlay to the pain complaints."  *Id.* at 498, 500.  Together, this constitutes substantial evidence supporting the ALJ's evaluation of Dr. Jones's opinion.

The ALJ also assigned the opinions of the record-reviewing psychologists, Dr. Lewin and Dr. Warren "no more than minimal, if any[,] weight."  *Id.* at 84.  She notes that they both gave Dr. Jones's opinion "great weight."  *Id.*  And, at the time of their review of the record, no other physician had addressed any complaints of mental

impairments by Plaintiff.  Thus, their opinions relied solely on Dr. Jones's opinion and Plaintiff's subjective reports.  Because of this reliance, their opinions were also entitled to little, if any, weight.  *Id.* at 84.

The ALJ provided several reasons, supported by substantial evidence, for finding that Plaintiff's mental impairments do not cause more than minimal limitation in his ability to perform basic mental work and, therefore, are not severe, and those reasons are supported by substantial evidence.  And, the ALJ's analysis did not stop here.  The Regulations require an ALJ to "consider the limiting effects of all [an individual's] impairment(s), even those that are not severe." 20 C.F.R. § 404.1545(e).  In the present case, ALJ Motta considered all of Plaintiff's impairments, including his mental health impairments, and reasonably concluded that he could perform a limited range of light work.

At step two, the ALJ addressed Plaintiff's mental impairments and weighed the opinions of Dr. Jones and the record-reviewing psychologists, and those findings are supported by substantial evidence.  She is not required to re-weigh their opinions at step four.  She does, however, mention that she rejected the opinions of the record-reviewing psychologists.  (Doc. #6, *PageID* #90).

There are no other opinions that indicate Plaintiff experiences limitations from his mental impairments.  Although Dr. Franer believes that the combined effects of mental and physical impairments can be greater than the sum of the parts, she indicated that she did not know if that would apply to Plaintiff because, "Patient was only seen on one occasion to address issues of [a] depressed mood and he did not follow up so I don't have

enough information . . . ." *Id.* at 527.  She then opined that Plaintiff may have limitations due to his pain.  *Id.* at 528-33.  For example, she noted, "Pain would have negatively affected his ability to be productive and maintain a schedule." *Id.* at 529.  The ALJ properly considered the effects of Plaintiff's pain in determining Plaintiff's residual functional capacity at step four.

### C.    Plaintiff's Credibility

Plaintiff asserts that the ALJ failed to evaluate his pain, credibility, and subjective complaints in accordance with the Regulations and Rulings.  The Sixth Circuit established the following analysis for evaluating a plaintiff's assertions of disabling pain:

> First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a).  Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*

*Rogers,* 486 F.3d at 247.  When evaluating the intensity, persistence, and limiting effects of a plaintiff's symptoms, Social Security Regulations require the ALJ to consider the following factors: daily activities; location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the plaintiff takes or has taken to alleviate symptoms; treatment, other than medication, the plaintiff receives or has received for relief of symptoms; any measures the plaintiff uses or has used to relieve symptoms; and other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c)(3).

The ALJ "must then make a finding on the credibility of the individual's statements about symptoms and their functional effects."  Soc. Sec. Rul. No. 96-7p, 1996 WL 374186, at *4 (Soc. Sec. Admin. July 2, 1996).[3]  "Social Security Ruling 96-7p also requires the ALJ explain his credibility determinations in his decision such that it must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Rogers*, 486 F.3d at 248 (internal quotation and footnote omitted); *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so.") (citation omitted).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of Health and Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987); *see Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007).  However, an ALJ's assessment of credibility must be supported by substantial evidence.  *Cruse,* 502 F.3d at 542 (citing *Walters,* 127 F.3d at 531).

The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ."  (Doc.

---

[3] The Social Security Administration issued Soc. Sec. R. No. 16-3p, effective March 16, 2016, which supersedes Soc. Sec. R. No. 96-7p.  At the time of the ALJ's decision in this case, Soc. Sec. R. No. 96-7p was still in effect.

#6, *PageID* #88).  Further, "having carefully considered [Plaintiff's] allegations in light of the objective evidence and clinical findings of record, they are not consistent with a finding of total disability . . . and cannot, therefore, be accepted as credible."  *Id.* at 90.

The ALJ provided several reasons in support of her credibility determination.  First, the ALJ found that the objective medical evidence undermined Plaintiff's credibility as to the severity of his symptoms.  For example, when Plaintiff saw his surgeon, Dr. Poelstra, after his surgery in June 2014, Plaintiff reported that after six weeks of physical therapy, he noticed some definite improvement.  He also indicated that he did not have the degree of weakness and/or the spasms that were present previously.  *Id.* at 481.  Further, Dr. Poelstra noted that x-rays from June 2014 revealed that the plate was in a good position and the bone was healing nicely.  *Id.* at 541.

The ALJ noted that Plaintiff has only received conservative care since his surgery.  He attended physical therapy for approximately three months.  In June 2014, he cancelled all his remaining appointments for therapy, informing the office that "[i]t has become too much for him to get to therapy due to the drive and having a limited budget."  *Id.* at 502.  But even with only three months of therapy, Dr. Beeman reported to Dr. Poelstra that Plaintiff's neck pain decreased twenty to twenty-five percent and his therapist noted slight improvement in his left upper limb strength.  *Id.* at 498.

The ALJ also found several inconsistencies between Plaintiff's testimony and his reports to his physicians.  For example, at the hearing, Plaintiff testified that he helps out "some" in the kitchen, tries to do some laundry, and has not mowed his grass in years.  *Id.* at 110.  He also reported spending a lot of time in his recliner.  *Id.*  However, Plaintiff

25

reported to Dr. Poelstra that his shoulders and neck became still after activities like working on his car.  *Id.* at 541.  In May 2014, Plaintiff reported to Dr. Beegan that he had mowed his yard a couple times, but he also noted that he had difficulty reaching into cabinets.  *Id.* at 512.  Finally, Plaintiff reported to Dr. Jones that he was primarily responsible for household chores, including cleaning, laundry, cooking, and grocery shopping.  *Id.* at 382.

The ALJ also notes that although Plaintiff alleges his disability began June 1, 2011, around the time he was terminated from his job, he did not stop working because of his impairments.  Instead, he stopped working because he was terminated after a difference of opinion with his boss. *Id.* at 90, 106.  Additionally, he did not receive treatment for his impairments until February 2012, when he presented to Grandview Hospital's Emergency Department.  *Id.* at 340.  Upon arrival, he reported left arm and leg numbness, and neck, right shoulder, and back pain.  *Id.*

Accordingly, for these reasons and given that an ALJ's credibility assessment are generally due great deference, *Walters,* 127 F.3d at 531, Plaintiff's challenges to the ALJ's credibility determinations lack merit.

**IT IS THEREFORE RECOMMENDED THAT**:

1.    The ALJ's non-disability decision be affirmed; and

2.    The case be terminated on the Court's docket.

Date:  February 2, 2017                        *s/Sharon L. Ovington*
                                               Sharon L. Ovington
                                             United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).